**Continuation of Application for Search Warrant**

I, Heather Williamson, being duly sworn, state as follows:

## I.     Introduction

1.     I make this Continuation of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property – a cellular telephone, namely, a red Apple iPhone XR with IMEI number 353067106914353 as described more fully in Attachment A (the "**Subject Device**") – that is currently in the possession of law enforcement, and the extraction of electronically stored information from that property as described in Attachment B.

2.     I am a Special Agent of the Drug Enforcement Administration ("DEA") and have been so employed since January 2013. I am currently assigned to the Grand Rapids District Office. Previously, I was assigned to the Southwest Border Initiative Group-3 ("SWB-3") and to the Los Angeles Strike Force for approximately six years. The Los Angeles Strike Force is an investigative group jointly led by the DEA and the FBI, and composed of several other federal, state, and local agencies that is focused on the disruption of the Mexico-based Sinaloa Cartel. Prior to working as a DEA Special Agent, I completed 20 weeks of training at the DEA Academy in Quantico, Virginia, which included instruction in narcotics identification, detection, trafficking, and interdiction; money laundering techniques; asset identification, seizure, and forfeiture; and techniques used by narcotics traffickers to avoid detection by law enforcement officials. I have investigated drug trafficking organizations involved in violating various federal laws, including, but

not limited to, unlawful importation of controlled substances; the distribution of controlled substances; manufacturing of controlled substances; and possession with intent to distribute controlled substances, including cocaine, methamphetamine, heroin, and other dangerous drugs; as well as money laundering. I have participated in investigations of unlawful drug trafficking and money laundering and, among other things, have conducted or participated in surveillance; execution of search warrants; debriefings of informants; reviewing of taped conversations and drug records; and have participated in investigations that include the interception of wire communications.

3. Through my training, education and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, the methods of payment for such drugs, the laundering of narcotics proceeds, and the dialect (lingo) and coded language used by narcotics traffickers. In connection with my duties, I investigate criminal violations of the federal and state controlled substance laws, including, but not limited to, conspiracy and attempt to possess with intent to distribute and to distribute controlled substances, in violation of Title 21, United States Code, Section 846; possession with intent to distribute and distribution of controlled substances, in violation of Title 21, United States Code, Section 841(a)(1); use of communication facilities to facilitate drug trafficking offenses, in violation of Title 21, United States Code, Section 843(b); and offenses involving money laundering as well as conspiracy and attempt to do the same, in violation of Title 18, United States Code, Sections 1956 and 1957.  Many of these

investigations also involve firearms offenses, including violations of Title 18, United States Code, Sections 922(g) and 924(c).

4. Because this Continuation is for the limited purpose of establishing probable cause to support the issuance of a search warrants for the proposed **Subject Device**, it contains only a summary of relevant facts. I have not included each and every fact known to me or to other law enforcement officers concerning the entities, individuals, and events described in this Continuation.

5. The statements contained in this Continuation are based in part on: (a) my personal participation in this investigation; (b) information provided by other federal and state law enforcement officers, including members of the Michigan State Police's West Michigan Enforcement Team (WEMET); (c) laboratory analysis reports; (d) surveillance reports; (e) criminal history records; (f) information from confidential informants; and (g) my training and experience and the training and experience of other law enforcement agents.

## II. Overview of Investigation

6. This Continuation is based on the DEA and WEMET's investigation into the drug trafficking activities of Delando JOHNSON, a/k/a "Fox," and his criminal associates. On January 29, 2021, Magistrate Judge Phillip J. Green of the United States District Court for the Western District of Michigan issued an arrest warrant pursuant to a criminal complaint charging D. JOHNSON with multiple instances of distribution of heroin. *See United States v. D. Johnson,* No. 21-mj-00043.

7. The continuation in support of the criminal complaint established probable cause that, in May 2020, D. JOHNSON distributed heroin on three separate occasions. The facts stated in that continuation are incorporated by reference here and can be provided to the Court upon request.

8. D. JOHNSON's criminal history includes state convictions for delivery/manufacturing of cocaine/heroin less than 50 grams in 2009; possession/purchase/use of fraudulent proof of age in the purchase of tobacco for minors also in 2009; possession of a controlled substance on school property less than 25 grams in 2011; possession of cocaine/heroin less than 25 grams in 2012; misdemeanor interfering with electronic communications in 2014; a second or subsequent conviction for delivery/manufacturing of cocaine/heroin less than 50 grams in 2015; larceny in a building also in 2015; and felony firearms/weapons and possession of a firearm by a felon also in 2015.

### III. PROBABLE CAUSE

#### A. D. JOHNSON's Historical Use of Cell Phones to Communicate about Drug Trafficking

9. Based on my training, experience, and familiarity with the investigation, I know that drug traffickers use their phones to communicate about drug trafficking. I also know that drug traffickers frequently utilize more than one cellular phone for their illegal activities in an effort to thwart detection by law enforcement.

10. Specifically, I know that D. JOHNSON uses cellular telephones to arrange drug deals and to communicate with fellow drug traffickers. For example,

D. JOHNSON used telephone number (231) 329-5909 in May 2020 to arrange three drug deals in which he sold heroin to a confidential source, as outlined in the criminal complaint. *See* No. 21-mj-00043. For each of the three deals, on May 4, 2020, May 11, 2020, and May 27, 2020, respectively, D. JOHNSON communicated directly with the confidential source via telephone number (231) 329-5909 to arrange to sell the source 3.83 grams, 10.3 grams, and 11.25 grams of heroin with fentanyl compound or methamphetamine.

11. As outlined in the criminal complaint, D. JOHNSON also used telephone number (231) 329-5909 to communicate with other drug traffickers in the Muskegon area, including BRENT WILKERSON.[1] Specifically, between October 26, 2020 and January 2, 2021, telephone number (231) 329-5909 was in contact with the phone WILKERSON used to arrange his own drug deals on 14 separate occasions.

**B.     D. JOHNSON's Arrest on February 2, 2021**

12. Beginning at approximately 7:14 a.m. on February 2, 2021, investigators conducted surveillance of the residence at 725 Allen Avenue, Muskegon, Michigan to attempt to execute the aforementioned arrest warrant of D. JOHNSON. Investigators knew that D. JOHNSON resided at 725 Allen Avenue based on a November 17, 2020 cell phone bill using that address as a billing residence.

---

[1] In January 2021, WILKERSON was charged by criminal complaint in the United States District Court for the Western District of Michigan based upon his sales of heroin to the same confidential source D. JOHNSON sold to as well his sales of heroin and methamphetamine to an undercover police officer posing as a drug customer. *See United States v. Wilkerson*, 1:21-mj-00045.

13. Shortly after 10:00 a.m. on February 2, 2021, D. JOHNSON exited the residence at 725 Allen Avenue and entered into a white GMC Yukon XL with no other passengers. A fully marked police car then initiated its lights and sirens and effected a traffic stop to arrest D. JOHNSON in the parking lot of a Muskegon area restaurant. After D. JOHNSON exited the vehicle, investigators conducted a pat down search of D. JOHNSON, recovering a quantity of cash from his pocket. Later, investigators conducted a second pat down search and recovered two baggies from D. JOHNSON's groin area. The baggies field tested positive as approximately 7.2 grams of heroin and approximately 5.7 grams of cocaine base (crack). In the center console area of the vehicle, investigators seized a digital scale with white residue. Also in the car, investigators seized a cellular telephone with call number (231) 329-5909 as well as the **Subject Device**.

14. Investigators subsequently applied for a warrant to search the residence at 725 Allen Avenue. On February 2, 2021, Magistrate Judge Ray Kent of the United States District Court for the Western District of Michigan issued the requested search warrant. *See* No. 21-mj-00064.

15. Investigators executed the search warrant at D. JOHNSON's residence the same day – February 2, 2021. At the time that investigators entered the residence, no one was inside. During their subsequent search, investigators located a locked safe inside a kitchen cabinet of the residence. D. JOHNSON was ultimately found to have the key to the safe, which he had stored on the same key ring on which

he had also placed the key to the white GMC Yukon XL and the key to the residence at 725 Allen Avenue.

16. Investigators unlocked the safe. Inside, they found what subsequently field tested positive as approximately 10.5 grams of cocaine base (crack) and 67 grams of heroin/fentanyl. Investigators also found a loaded .45 caliber handgun inside the safe as well as more than $5,900 in cash.

17. Also in the kitchen of 725 Allen Avenue, investigators found two digital scales and baggies used to package drugs. These are items that I know, based upon my training and experience, to be indicative of drug trafficking.

18. In the bedrooms of the house, investigators located mail in D. JOHNSON's name (but bearing an address other than 725 Allen Avenue). Investigators also located several fully loaded magazines for a .223 rifle and various rounds of loose ammunition. Because D. JOHNSON is a convicted felon, I know that he is prohibited from possessing firearms and ammunition.

19. Finally, in one of the bedrooms, investigators recovered a bag of suspected methamphetamine. The drugs were subsequently weighed and field tested as approximately 290 grams of methamphetamine.

    **C.**     **Probable Cause to Search the Subject Device**

20. There is probable cause to believe that forensic examination of the **Subject Device** will reveal electronic evidence of drug trafficking. The applied-for warrant would authorize the forensic examination of the **Subject Device** listed in

Attachment A for the purpose of identifying electronically stored data particularly described in Attachment B.

21.  As shown above, D. JOHNSON uses cellular phones to arrange drug deals.  Furthermore, D. JOHNSON uses cellular phones to communicate with other known drug traffickers in the Muskegon area.

22.  I know from training and experience that drug traffickers frequently utilize mobile telephones to facilitate drug transactions.  Drug traffickers rely upon voice phone services, SMS and MMS text messaging, social media instant messaging services, and electronic mail apps to communicate with suppliers, customers, and confederates.  Mobile telephones are portable and phone providers often do not require purchasers or users of the devices to provide their true names and/or addresses, so drug traffickers often maintain multiple devices to avoid detection by law enforcement.  Mobile phones often contain evidence indicative of drug trafficking, including records of incoming and outgoing calls; text messages; photographs of narcotics, coconspirators, or currency; and, in the case of "smart phones," Global Positioning System ("GPS") data indicating the location of the device at given points in time.

23.  Based on my training and experience, I know that electronic devices such as the **Subject Device**, can be used to store electronic information for long periods of times, including years.  Even if a drug trafficker is being cautious of law enforcement detection and deleting the substance of communications, significant data may still remain on the phone, such as call logs, contact information,

photographs, wireless internet connections (which can reveal location information), and other location information.

24. Further, based upon my training, experience, and participation in drug investigations and financial investigations relating to drug investigations, I am aware of the following:

  a. Drug traffickers often keep names, aliases, and/or contact information of suppliers, purchasers, and others involved in drug trafficking in their devices;

  b. Drug traffickers sometimes use electronic messaging or messaging apps, in addition to MMS, SMS text messages, and voice call, to communicate with suppliers, purchasers, and others involved in drug trafficking on their devices;

  c. Drug traffickers often take pictures or videos of their drug trafficking associates, drugs, money and/or firearms, which they store on their devices;

  d. Drug traffickers often maintain, on hand, large amounts of currency in order to maintain and finance their on-going narcotics business and often store information related to the profits of their narcotics trafficking on their devices;

  e. Global Position System (GPS) data on phones may show the location of a drug trafficker at a given time, which may provide corroborating evidence of a drug delivery or other instance of drug trafficking;

  f. User attribution data and usernames, passwords, documents, and browsing history can provide evidence that the device is being used by a drug trafficker and can provide other useful evidence to the drug investigation;

  g. Drug traffickers often use the Internet to look up various information to support their drug trafficking activities on their devices;

  h. Drug traffickers often have unexplained wealth and assets as they do not have a job, nor do they report income on their state or

      federal tax returns. Subjects often use cash, money orders, and cashier's checks, and prepaid debit cards as a way of purchasing items as a way to disguise where the funds are ultimately coming from. Subjects will place assets in the names of nominees, which are often friends and family members in an attempt to hide the true ownership of the assets. It is common for drug traffickers to maintain books, records, receipts, notes, ledgers, receipts relating to the purchase of financial instruments and or the transfer of funds, and other papers relating to the transportation, ordering, sale and distribution of controlled substances. That the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the traffickers have ready access to them, including their devices;

    i.    It is common for persons involved in drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and or expenditure of drug proceeds on their devices. This evidence includes information related to currency, financial instruments, precious metals and gemstones, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box receipts or keys, records concerning storage lockers and money wrappers; and

    j.    Drug traffickers frequently receive their supply of drugs through packages sent by U.S. Mail or third-party delivery service and frequently keep copies of tracking numbers, receipts and photographs of packaged narcotics on their devices.

## TECHNICAL TERMS

25.    Based on my training and experience, I use the following technical terms to convey the following meanings:

    a.    Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice

communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using

       specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

   e.    PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments, or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

   f.    IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

   g.    Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

26.    Based on my training and experience, I believe that the **Subject Device** has capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and/or PDA.  In my training and

experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

27. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

28. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **Subject Device** was used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the **Subject Device** because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

   d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to

      investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

29. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

30. *Manner of execution.* Because this warrant sought in this continuation seeks permission to examine a device that is currently in the possession of law enforcement, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant for search of the **Subject Device** at any time in the day or night.

## IV. Conclusion

31. Based on the above information, I believe that there is probable cause to search the **Subject Device**.